UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X
MAKEBA CARPENTER,

      Plaintiff,               MEMORANDUM AND ORDER

  -against-              Civil Action No.
                           CV-04-3568 (DGT)
NEW YORK CITY TRANSIT AUTHORITY &
MANHATTAN AND BRONX SURFACE
TRANSIT OPERATING AUTHORITY

      Defendants.

-------------------------------X

Trager, J:

Pro se plaintiff Makeba Carpenter ("plaintiff") brings this action for race discrimination pursuant to Title VII of the Civil Rights Act of 1964.[1] Plaintiff, a black woman, claims that she was dismissed from her probationary employment as a bus driver because of her race. Defendants, New York City Transit Authority ("NYCTA") and Manhattan and Bronx Surface Transit Operating Authority ("MABSTOA"), request summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

---

[1] Plaintiff's complaint is unclear, so she may also be raising claims under 42 U.S.C. § 1981 and § 1983. However, plaintiff makes no allegations of a discriminatory municipal policy or custom necessary to bring a claim under either of the statutes against a municipal defendant. Therefore, only the Title VII claim will be addressed.

## Background

For purposes of defendants' summary judgment motion, all of plaintiff's statements, as made in her complaint and deposition, are taken as true. Any disputed facts are viewed in the light most favorable to the plaintiff, the non-moving party. All facts are agreed upon by both parties unless otherwise noted.

MABSTOA hired plaintiff as a probationary bus driver on April 21, 2003. Decl. of Joyce Rachel Ellman ("Ellman Decl."), Ex. 1, 2. During her probationary period, on June 28, 2003, plaintiff, driving a MABSTOA bus, tried to make a right turn onto 146th Street from Adam Clayton Powell Blvd when she hit a stationary car with a driver in it. Ellman Decl., Ex. 2. After her accident, plaintiff was sent for re-training and re-testing on two separate dates. Ellman Decl., Ex. 2. Plaintiff claims that immediately after the accident she was taken for drug-testing. Ellman Decl., Ex. 6. Plaintiff failed the first re-training and re-testing on July 3, 2003. Ellman Decl., Ex. 2, 3. According to the evaluation form, the instructor failed plaintiff because she operated with a fixed stare; did not stop or yield to a fire engine exiting a firehouse; made a wide right turn into oncoming traffic; made a short right turn and ran over the curb; and did not "cover the right side" of the bus. Ellman Decl., Ex. 3.

Plaintiff does not dispute what happened during her driving test.  She claims that she failed not because of the flaws the instructor noted, but because two supervisors, Mr. Williams and Mr. Howard, disliked her.  On her first re-training day, July 3, 2003, plaintiff thought that one of her training supervisors, Mr. Williams, was unjustifiably rude to her and did not like her: "I'm claiming that Mr. Williams did not like me . . . I don't know why he didn't like me."  Ellman Decl., Ex. 8, Carpenter Dep. ("Dep."), p. 68.  Mr. Williams, who plaintiff testified she thought was black, was her instructor that entire first re-training day.  Dep., p. 64.  During her deposition, when asked if Mr. Williams discriminated against her in any way, plaintiff responded that he disliked her and that she did not know why. Dep., p. 68.  Plaintiff testified that she thought Mr. Williams did not like her based on "his whole character, his whole disposition."  Dep., p. 64.  Mr. Williams did not exchange pleasantries, such as good morning or good evening, with anyone in the group.  Dep., p. 64.  Plaintiff took Mr. Williams' brusqueness personally and felt that it was a manifestation of his dislike for her.

Plaintiff sketches a domino-effect of dislike.  Because of Mr. Williams' dislike of her, plaintiff testified, another supervisor, Mr. Howard, spoke to her inappropriately on the day of her first re-training.  Dep., p. 69.  Mr. Howard, who is also

black, told plaintiff that he had friends at the bus depot that plaintiff was based at because he used to work there. Dep., p. 69. He told plaintiff that "[a]ll of my friends work for Manhattanville and they are going to take care of you when you get there." Dep., p. 69. This statement could be interpreted as friendly or helpful. Even Carpenter does not claim that this was a threat or discrimination, but that Mr. Howard addressed her in an inappropriate manner: "I didn't understand why Mr. Howard was addressing me like that. He didn't have no [sic] reason to talk to me like that because he didn't know me." Dep., p. 70. The first re-testing, on July 3, 2003, was the last time that plaintiff saw either Mr. Howard or Mr. Williams. Dep., p. 72.

It was because of this alleged bias against her, stemming from Mr. Williams' dislike, which was manifested by his failure to exchange pleasantries, and not because of her driving, plaintiff claims, that she failed the first re-testing.

Plaintiff's second re-testing was on July 7, 2003. On that day, plaintiff claims that she failed not because of her faulty driving, but because her evaluator, Mr. Santos, was "Spanish" and favored a "Spanish driver". Dep., p. 73-74, 88. Plaintiff described both the instructor and driver as Spanish because they spoke Spanish. When asked, she could not describe either man's ethnicity in any other way. Dep., p. 75. From the driving records submitted by defendant, the only Hispanic man in the

4

group was Luis Taboada-Pilca. Ellman Decl., Ex. 4. It is, therefore, assumed that he is the Spanish-speaking driver to whom plaintiff was referring. Plaintiff testified that Mr. Santos favored Mr. Taboada-Pilca over the other drivers because of their common language: "I didn't appreciate how he treated – he didn't treat everybody the same . . . He favored the Spanish man." Dep., p. 73-74. When asked: "[I]s there any individual at the Authority who you're claiming discriminated against you based on your race?", plaintiff answered "No" and explained that she had complained because Mr. Santos did not treat everyone equally and favored Mr. Taboada-Pilca by having him drive first and immediately returning his evaluation to him. Dep., p.73-74. However, the test was not a competition; everyone, regardless of their order, could have passed.

At the beginning of the day, before the road test, plaintiff was sitting in the back of the room. Mr. Santos told her to move up in order to sit with everyone else and that no one was out to get her. Dep., p. 88. During the road test, Mr. Santos spoke Spanish to Mr. Taboada-Pilca, had him drive first and gave his evaluation back to him immediately. Dep., p. 74-75. The other drivers, however, had to wait a longer period of time before they received their evaluations. Dep., p. 74. Mr. Santos did not tell plaintiff, nor did she ask about, the results of the road test. Dep., p. 90. Otherwise, it appears that Mr. Santos

treated all of the drivers equally. Mr. Santos gave all of the drivers, including plaintiff, instructions during their test and spoke to them, except for Mr. Taboada-Pilca, in English. Dep., p. 83. After her road test, plaintiff and the other drivers returned to the training center and waited two-and-a-half hours for their reports. Ellman Decl., Ex. 6 ("Pl.'s Compl."), p. 2. Mr. Taboada-Pilca, however, was released as soon as the training bus returned. Pl.'s Compl., p. 2.

Plaintiff testified that she thought that there were a total of seven bus operators and that she was the only black woman in the group being tested on July 7, 2003. Dep., p. 77. Plaintiff testified that she was one of two women in the group, but was unsure of the other woman's race. Dep., p. 76, 84. Defendants submitted evaluations of four other drivers who took the driving test on that day: Taboada-Pilca, Lucia Lewis, Thomas Mason and Patrick Roberts. Ellman Decl., Ex. 4. Attached to the evaluations of the other drivers were sheets with personal data, including ethnic group, for each. According to the personal data sheets, Taboada-Pilca was Hispanic, Lewis was black, Mason was white and Roberts was black. Ellman Decl., Ex. 4. All of them passed the driving test. Ellman Decl., Ex. 4. According to the evaluation form, the instructor failed plaintiff because she again operated with a fixed stare; did not check her right side; entered an intersection on a yellow light; and did not scan the

bus's mirrors enough. Ellman Decl., Ex. 3.

Plaintiff eventually returned to Manhattanville, the depot where she had been stationed. Dep., p. 90. At Manhattanville, plaintiff was told to take two days off and call for her assignment. Pl.'s Compl., p. 3. Plaintiff called repeatedly for an assignment and, after four days, was told that she had been terminated. Pl.'s Compl., p. 3.

After being terminated from her probationary employment, plaintiff sent letters to Mayor Bloomberg and to President Bush. Pl.'s Compl., p. 3. Her letter to President Bush was forwarded to the Equal Employment Opportunity Commission ("EEOC"). Pl.'s Compl., p. 3. On March 9, 2004, plaintiff filed a charge with the EEOC against defendant NYCTA. Ellman Decl., Ex. 5. The EEOC issued a-right-to-sue letter on June 2, 2004, and plaintiff then filed a discrimination charge with either the New York State Division of Human Rights ("NYSDHR") or the New York City Commission on Human Rights ("NYCCHR"). Ellman Decl., Ex. 6, p. 4, 6. Plaintiff filed suit against the NYCTA for termination of employment and unequal terms and conditions of employment on August 16, 2004. Ellman Decl., Ex. 6. On January 11, 2005, by order of the Court, the complaint was amended to add MABSTOA as a defendant. Ellman Decl., Ex. 6. Plaintiff maintains that her probationary period was terminated because of her race, that she was treated unfairly and that NYCTA and MABSTOA have prevented

7

her from getting similar transit jobs by providing bad references. Pl.'s Compl. at 3. MABSTOA replies that plaintiff's probation was terminated because of her initial accident and subsequent inability to pass a driving test. Ellman Decl., Ex. 2.

**Discussion**

**(1)**

**Summary Judgment Standard of Review**

Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-movant, "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)); see Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir. 2000); Tishman Speyers v. Pamphile, No. 03 CV 5964, 2006 WL 1806505, at *3 (E.D.N.Y. June 29, 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

While the same standards apply when the plaintiff is pro se, "courts must construe pro se pleadings broadly, and interpret them to raise the strongest arguments that they suggest." Cruz, 202 F.3d at 597 (quoting Graham v. Henderson, 89 F.3d 75, 59 (2d

Cir. 1996)); see Alston v. N.Y. City Transit Auth, No. 02 CV 2400, 2003 WL 22871917, at *2 (S.D.N.Y. Dec. 3, 2003) (citations and quotations omitted).

In the instant case, defendants have moved for summary judgment to dismiss plaintiff's claims first on the grounds of technical deficiencies, specifically: improper suit, failure to exhaust administrative remedies and the doctrine of election of remedies. If plaintiff's complaint survives these challenges, defendants argue, it must nevertheless be dismissed for failure to set forth a prima facie case of race discrimination.

**(2)**

**Procedural Defects**

Before proceeding to the merits of plaintiff's complaint, defendants have identified two procedural defects: 1) plaintiff improperly sued NYCTA though employed by MABSTOA and 2) plaintiff sued MABSTOA without first exhausting her administrative remedies.

**a. Plaintiff Was Employed by MABSTOA, Not NYCTA**

Defendants claim that plaintiff has improperly sued the NYCTA because she was never employed by NYCTA. Def.'s Mem. of Law in Supp. of Mot. for Summ. J., 4. MABSTOA and NYCTA were both created under the New York State Public Authorities Law, and

9

MABSTOA is a subsidiary of the NYCTA. However, the two are separate legal entities. See Ford v. N.Y. City Transit Auth., No. 98 CV 4768, 2001 WL 930778, at *1 n.1 (E.D.N.Y. May 31, 2001); Toriola v. N.Y. City Transit Auth., No. 02 CV 5902, 2005 WL 550973, at *4 (S.D.N.Y. Mar. 9, 2005) (citations omitted).

Even though MABSTOA and NYCTA are separate legal entities, the parent-subsidiary relationship deserves attention because it blurs the lines separating the two. "A parent may be considered the employer of a subsidiary's employees for Title VII purposes depending on whether the parent exercises centralized control of labor relations." Toriola, 2005 WL 550973, at *5 (internal quotations omitted). Moreover, other courts have treated both entities as a single employer in Title VII claims. See Zerelli-Edelglass v. N.Y. City Transit Auth., 33 F.3d 74, 77 n.4 (2d Cir. 2003) (treating MABSTOA and NYCTA as a single employer in Title VII sex discrimination claim when MABSTOA was the actual employer); Smith v. MABSTOA/NYCTA, No. 02 CV 220, 2005 WL 1123730, at *1 (S.D.N.Y. May 11, 2005) ("NYCTA and MABSTOA are separate entities, but share a common personnel department"). In Toriola, with far more evidence before it, the district court held that because "questions of fact abound as to whether the NYCTA and MABSTOA may be considered a single employer for Title VII claims, the Court cannot resolve this issue at the summary judgment stage." Toriola, 2005 WL 550973, at *5.

Here, with a dearth of evidence about the relationship between NYCTA and MABSTOA, it is inappropriate to reach a conclusion as to whether plaintiff's claim is barred because she sued the wrong authority.

**b. EEOC Charge**

Defendants argue that plaintiff's failure to file an EEOC charge against MABSTOA, her actual employer, is a fatal defect in the complaint. It is unnecessary to address this issue because it has not yet been decided if it is appropriate to only sue NYCTA, which did have EEOC charges brought against it. As the case is decided on other grounds, there is no need to reach a decision on this issue.

(3)

### Prima Facie Case of Discrimination

Turning to the merits of plaintiff's claim, defendants argue that even if none of the procedural challenges were fatal, plaintiff's claim must be dismissed because she has failed to set forth a prima facie case of race discrimination.

Under Title VII it is unlawful "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual . . . because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a). The

11

goal is to prevent disparate treatment because of differences in these characteristics. See Toriola, 2005 WL 550973, at *7 (quotations omitted). A race discrimination claim is analyzed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). First, the plaintiff bears the burden of establishing a prima facie case of discrimination. Ford, 2001 WL 930778, at *6. Plaintiff must point to evidence that: 1) she was a member of a protected class; 2) was qualified for the position; 3) suffered an adverse employment action; and 4) that the adverse employment action could give rise to an inference of discriminatory intent. Feingold v. N.Y., 366 F.3d 138, 152 (2d Cir. 2004) (citations omitted).

Then, once a plaintiff has made a prima facie case by meeting these requirements, a presumption of discriminatory animus arises, and the burden shifts to the employer, who must present a "legitimate, non-discriminatory business rationale for its conduct." Id. (citing McDonnell Douglas, 411 U.S. at 802). If the employer presents a legitimate reason for the adverse action then the burden returns to plaintiff, who must show that "circumstances that would be sufficient to permit a rational trier of fact to infer that defendant's employment decision was more likely than not based in whole or in part on discrimination." Id. (quotations omitted).

Following this framework in the instant case, the analysis begins with whether plaintiff has met her initial burden. Plaintiff satisfies the first requirement, membership in a protected class, and the third requirement, suffering an adverse employment action. Given the de minimus standard for the second requirement, being qualified for the position, it is assumed that because she had the appropriate license that she meets this standard as well. She has not, however, satisfied the fourth requirement, suffering the adverse employment action under circumstances that could give rise to an inference of discrimination. Moreover, even if plaintiff had met her burden and made a prima facie case, defendant has offered a legitimate, nondiscriminatory business rationale for its conduct.

Plaintiff's complaint fails the last requirement of the prima facie case because the evidence does not give rise to an inference of discriminatory intent. See Feingold, 366 F.3d at 152; Toriola, 2005 WL 550973, at *9 (finding legitimate reason for termination of probationary bus driver when his driving record included accidents, failing to protect the right side of the bus and other hazardous driving practices); Ford, 2001 WL 930778, at *8 (finding no basis for race discrimination claim when plaintiff was not promoted based on defendant's showing of declining job performance).

Defendants have submitted ample evidence of plaintiff's lack

13

of qualification and unacceptable performance. Ellman Decl., Ex. 2. Even though plaintiff suggests that she should be compared to the other drivers evaluated along with her on the second re-testing, such a comparison only indicates that there was no discrimination because plaintiff made errors (which she does not dispute) while the other drivers did not. See Toriola, 2005 WL 550973, at *8-9. Only if the other drivers had performed in a manner comparable to plaintiff would it be appropriate to compare their treatment in a manner favorable to the plaintiff. See id. Since plaintiff's driving was significantly worse than that of the other drivers, there is no indication that she was held to a different workplace standard from the other drivers. See id. Furthermore, any minor acts of favoritism (such as order in taking the driving test) are not sufficiently adverse to be actionable.

Even if plaintiff could point to the evidence establishing a prima facie case, defendants have indicated that there were legitimate, nondiscriminatory reasons for her termination. The defendants have clearly shown that the decisions surrounding plaintiff's termination were based on her job performance and her test results, not her race. See id; Ford, 2001 WL 930778, at *8. As discussed, there was no inference of race discrimination. Likewise, plaintiff cannot point to evidence of discrimination that would in any way show that defendants' business decision was

a pretext to terminate her.  Plaintiff's claim of race discrimination therefore fails as a matter of law.

### (4)

### State Law Claims

Defendants also argue that plaintiff's state law claims, based on violations of New York law, are barred by the doctrine of election of remedies because plaintiff filed a complaint with NYSDHR or NYCCHR.  On her pro se complaint, plaintiff noted that she filed with either the state or local agency approximately six months after filing her EEOC complaint.  Despite the fact that defendants would have presumably received notice of the charge, they have supplied no further information.

Whether a state law claim is barred by the doctrine of election of remedies depends on whether the complaint was addressed on the merits by the local agency (which would require an appeal to a state court) or whether there was a dismissal either for an administrative reason or at the charging party's request (requiring no such appeal).  See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75-76 (2d Cir. 2000)(citing N.Y. Exec. Law 297(9)).

In the instant case, absolutely no evidence was submitted about plaintiff's NYSDHR or NYCCHR claim giving any insight to its status or with which agency plaintiff filed her complaint.

It is entirely inappropriate to dismiss plaintiff's substantive state law claims based on the mere allegation that she filed an administrative complaint.

Defendants' last contention, which consumed seven pages of their brief, is that as an NYCTA subsidiary MABSTOA is not subject to the jurisdiction of local law.  Def.'s Mot. for Summ. J., at 15.  These claims are not within the federal question jurisdiction of this court; all of those claims have been dismissed.  Therefore, there is no longer pendant jurisdiction over plaintiff's state and local claims.  Plaintiff's state law claims are dismissed without prejudice.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted and all of plaintiff's federal law claims are dismissed with prejudice. Plaintiff's state law claims are dismissed without prejudice. The Clerk of the Court is directed to close this case.


Dated:   Brooklyn, New York
         August 25, 2006



                                    SO ORDERED:



                                       /s/
                                    David G. Trager
                                    United States District Judge